[Cite as *State v. Calvin*, 2015-Ohio-4801.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

SAUDI CALVIN,

    DEFENDANT-APPELLANT.

CASE NO. 5-15-17

O P I N I O N

Appeal from Hancock County Common Pleas Court
Trial Court No. 2014-CR-00138

Judgment Affirmed

Date of Decision: November 23, 2015

APPEARANCES:

    *Kenneth J. Rexford* for Appellant

    *Elizabeth H. Smith* for Appellee

**WILLAMOWSKI, J.**

**{¶1}** Defendant-appellant, Saudi Calvin ("Calvin"), brings this appeal from the judgment of the Common Pleas Court of Hancock County, Ohio, denying his motion to suppress, finding him guilty of aggravated possession of drugs, a felony of the third degree in violation of R.C. 2925.11(A), and sentencing him to twenty-four months in prison. For the reasons that follow, we affirm the trial court's judgment.

### *Factual and Procedural Background*

**{¶2}** The facts relevant to this appeal have been summarized in the trial court's judgment entry as follows. On May 29, 2014,[1] at approximately 1:20 a.m., Calvin was pulled over for speeding by Sergeant Jacob Fletcher ("Sergeant Fletcher") of the Ohio State Highway Patrol ("OSHP"). (R. at 53.) Sergeant Fletcher discovered that Calvin had been driving under suspension, and arrested him for the offense. Thereafter,

> [Sergeant Fletcher] decided to tow the vehicle since Defendant was an out-of-state resident and there was no other reasonable alternative nearby to handle safekeeping of the vehicle due to its location on Interstate 75 and the unknown length of time the vehicle would be unsupervised.
>
> Sgt. Fletcher began conducting an inventory of the vehicle. The Ohio State Highway Patrol mandates that its troopers complete an Administrative Inventory and Custody Report (State's Exhibit 1) any time a vehicle is taken by a person without the driver for the

---

[1] A typographical error appears in the trial court's Decision and Judgment Entry on page 3, stating that the events at issue occurred on May 9, 2014, which is inconsistent with the testimony and the record. (*Compare* R. at 53, at 3, *with* R. at 1, Indictment, *and* Tr. at 10-14.)

purposes of protecting the driver's valuables and protecting the officers, tow drivers, or any third parties from liability for valuables contained within the vehicle. Sgt. Fletcher filled out an Administrative Inventory/Custody Report in this matter. (State's Exhibit 2). Sgt. Fletcher started at the front passenger compartment before moving on to the glove box, the rear passenger compartments, and the trunk. Defendant informed Sgt. Fletcher that the trunk was faulty and could only be opened by pulling a string which triggered a release of the trunk. Sgt. Fletcher attempted to pull the string, however the string broke and the trunk did not release. Sgt. Fletcher then pulled the back seat down and gained access to the trunk, where he obtained a bag of miscellaneous clothing and a plastic bag of white pills located within a tennis shoe located in a gym bag. The pills were later determined to be 120 pills of Oxycodone and 11 pills of Alprazolam. Defendant did not produce a valid prescription. The vehicle was then taken to the Findlay Post of the Ohio State Highway Patrol for an additional search as a result of the discovery of the pills. Defendant, Saudi Calvin, admitted that the pills belonged to him and that he had packed the pills in the gym bag.

(*Id.* at 4.)

{¶3} As a result of these events, Calvin was indicted on June 10, 2014, for aggravated possession of drugs in violation of R.C. 2925.11(A), a felony of the third degree. (*See* R. at 1.) Calvin filed a motion to suppress, arguing two grounds for suppression: unlawful arrest and unlawful search of his vehicle. (R. at 31.) He eventually limited his arguments to the lawfulness of the search, alleging that the warrantless search of his vehicle was not within the scope of the inventory search exception to the warrant requirement, as was maintained by the State. (*See* R. at 49, at 2.)

**{¶4}** The parties appeared for a suppression hearing on February 9, 2015, to offer testimony of one witness, Sergeant Fletcher. The State submitted three exhibits: Exhibit 1, "A copy of the Ohio State Highway Patrol Policy Number OSP-200.10, titled Administrative Inventory and Custody Report"; Exhibit 2, "A copy of the Ohio State Highway Patrol Vehicle Inventory/Custody Report of a 1999 Dodge Intrepid purportedly driven by Saudi Calvin dated May 29, 2014"; Exhibit 3, "A DVD disc of the traffic stop titled Saudi Calvin 5-29-14." (*See* Tr. at 4, 65.) Additionally, closing briefs were filed after the hearing. (R. at 49, 50.)

**{¶5}** The trial court denied the motion to suppress on March 2, 2015. (R. at 53.) Subsequently, Calvin entered a plea of no contest and was found guilty of aggravated possession of drugs, a felony of the third degree in violation of R.C. 2925.11(A). He filed a timely notice of appeal and presents one assignment of error for our review, as follows.

> **The Trial Court erred by not suppressing the fruits of a warrantless search of Mr. Calvin's vehicle, thereby denying to Mr. Calvin his rights to freedom from unreasonable searches and seizures as guaranteed to him by both the United States Constitution and the Ohio Constitution.**

### *Standard of Review*

**{¶6}** An appellate review of the trial court's decision on a motion to suppress involves a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8; *State v. Norman*, 136 Ohio App.3d 46, 51, 735 N.E.2d 953 (3d Dist.1999). We will accept the trial court's

factual findings if they are supported by competent, credible evidence, because the "evaluation of evidence and the credibility of witnesses" at the suppression hearing are issues for the trier of fact. *State v. Mills*, 62 Ohio St.3d 357, 366, 582 N.E.2d 972 (1992); *Norman* at 51; *Burnside* at ¶ 8. But we must independently determine, without deference to the trial court, whether these factual findings satisfy the legal standard as a matter of law because "the application of the law to the trial court's findings of fact is subject to a *de novo* standard of review." *Norman* at 52; *Burnside* at ¶ 8.

{¶7} Under this standard of review, the trial court's findings of fact recited above are accepted as true, as they are supported by competent and credible evidence adduced at the hearing. We thus proceed to analyze the legal issue of whether these facts support the trial court's conclusion that Calvin's constitutional rights were not violated in this case as a result of the warrantless search of his vehicle.

*Law and Analysis*

{¶8} It is well established that a warrantless search is per se unreasonable unless certain "specifically established and well delineated exceptions" exist. *City of Xenia v. Wallace*, 37 Ohio St.3d 216, 218, 524 N.E.2d 889 (1988), quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 454-455, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The burden is on the state to establish that a warrantless search is

valid under one of these exceptions. *State v. Williams*, 3d Dist. Seneca No. 13-06-46, 2007-Ohio-5489, ¶ 19. One of the well-established exceptions, at issue in this case, is "[a]n inventory search of a lawfully impounded vehicle." *State v. Hathman*, 65 Ohio St.3d 403, 405, 1992-Ohio-63, 604 N.E.2d 743 (1992).

{¶9} The landmark case for the inventory search exception is *S. Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). There, the United States Supreme Court recognized "three distinct needs" that justify the inventory search exception to the warrant requirement: (1) "the protection of the owner's property while it remains in police custody"; (2) "the protection of the police against claims or disputes over lost or stolen property"; and (3) the protection of the police and the public from potential danger. *Id.* at 369; *see also id.* at 376, fn. 10 ("The protection of the municipality and public officers from claims of lost or stolen property and the protection of the public from vandals who might find a firearm, * * * or as here, contraband drugs, are also crucial."); *accord State v. Mesa*, 87 Ohio St.3d 105, 109, 1999-Ohio-253, 717 N.E.2d 329 (1999).

{¶10} The Ohio Supreme Court has recognized that "the validity of an inventory search of a lawfully impounded vehicle is judged by the Fourth Amendment's standard of reasonableness." *Mesa* at 109, citing *Opperman* and *Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987). In order to assure reasonableness of the inventory search, "an inventory search of a lawfully impounded vehicle must be conducted in good faith and in accordance

-6-

with reasonable standardized procedure(s) or established routine." *Hathman* at paragraph one of the syllabus, citing *Opperman*, *Bertine*, *and Florida v. Wells*, 495 U.S. 1, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990); *accord Blue Ash v. Kavanagh*, 113 Ohio St.3d 67, 2007-Ohio-1103, 862 N.E.2d 810, 812, ¶ 11.

{¶11} The trial court in this case concluded that the State sufficiently proved this exception and satisfied the *Opperman* standard. Yet, Calvin argues that the exception for inventory search should not have been applied because this case did not involve an impoundment of his vehicle. He further suggests that the standardized procedures in place were not reasonable and they were not properly followed by Sergeant Fletcher. We address each challenge separately.

*1. Does the Case Involve an Impoundment?*

{¶12} The first argument on appeal concerns Sergeant Fletcher's statement that Calvin's vehicle was not going to be impounded, but only "towed for everyone's well-being and safekeeping" into a private tow company's lot. (Tr. at 40:6-13; App't Br. at 9.) Calvin suggests that towing does not fall within the inventory search exception to the warrant requirement because it involves a mere "assistance," rather than "taking control of the vehicle." (App't Br. at 9-10.) He thus draws a distinction between the terms "tow" and "impound," claiming that a mere tow "is not the same trigger for the claimed inventory search" and that only the situations that give the law enforcement "physical possession of the vehicle" create an "impoundment" and fall into the inventory search exception. (*Id.*)

-7-

Under this reasoning, until Sergeant Fletcher decided that the vehicle was destined for the patrol post or a police-owned and operated impound lot, no justification for an inventory search existed. (*See id.*)

{¶13} Our review of the record and the case law does not support a legal distinction between the two terms. In fact, research indicates that the terms "tow" and "impound" are often used interchangeably, to refer to various situations when law enforcement officials take a vehicle out of the control of the driver or owner.

{¶14} We recognize that during cross-examination Sergeant Fletcher admitted that there is "a difference between a tow and an impound [sic]," and that a vehicle can be towed "without impounding." (Tr. at 39:2-4.) Yet, no specific explanation was given for the distinction,[2] and according to Sergeant Fletcher, both situations require inventory search, which should be performed any time the police take "custody of a vehicle." (Tr. at 51:15-17.) Sergeant Fletcher further described situations in which an administrative inventory of a vehicle is performed, as follows:

> Any time we take custody of it or any time we take the Defendant we, I guess basically, for lack of better terms, take it from the Defendant. I guess in a sense a*ny time we impound a car*. Any time a tow truck comes to the scene of the crash or a traffic stop and takes the vehicle and either the owner or the driver at the time does not go with them with the vehicle, if they are separated, we are required to do a vehicle inventory of that vehicle.

---

[2] Some explanation can be gained from State's Ex. 3, where Sergeant Fletcher can be heard explaining to Calvin that his car was not going to be impounded but towed, which meant that he would be able to get the car upon release from jail. (Ex. 3 at minute 18:13-18:23.)

(Emphasis added.) (Tr. at 24:1-9.) When later referring to Exhibit 2, Vehicle Inventory/Custody Report, Sergeant Fletcher stated that the document is used for "different reasons why we're towing it, taking custody of it, removing it from the roadway." (Tr. at 25:10-12.) On cross-examination, Sergeant Fletcher further reiterated, "any time I take custody of someone's vehicle, whether it's at a traffic crash, whether it's -- * * * -- when we're taking the vehicle from people we need to document the items of value." (Tr. at 49:12-16.) Sergeant Fletcher testified that the towing procedures in place involve calling a dispatcher, who assigns a towing company from "multiple tow companies that are set up on a rotation * * * through the computerized dispatching system." (Tr. at 20:6-9.) The above explanation does not distinguish between a tow by a private towing company and a tow by some sort of a police-operated tow truck. On the contrary, it implies that the OSHP procedure for impounding or towing a car involves calling a dispatcher who assigns a private towing company from the "multiple tow companies that are set up on a rotation." (Tr. at 20:6-7.)

{¶15} Sergeant Fletcher's testimony is consistent with the OSHP written policy, which does not distinguish between towing for the purpose of safekeeping and towing for the purpose of impounding. (*See* Ex. 1, Policy No. OSP-200.10 § (A)(4); *see also* Tr. at 40:15-24.) This policy indicates that an administrative inventory is necessary whenever officers "remove motor vehicles or other property from the scene to a location of greater security." (*Id.*) Therefore, it implies that an

action of having the vehicle towed under the direction and control of the police officer, be it to the patrol post or to the towing company's lot, is treated the same way by the OSHP for the purpose of the administrative inventory of the car, whether formally labeled as an impoundment or not.

{¶16} Although the exact question presented before us has not been addressed before, Ohio case law supports a conclusion that any time a vehicle is "properly in police custody," it may be subject to an inventory search "pursuant to standard police policy or practice." *State v. Arbuckle*, 9th Dist. Lorain No. 94CA005823, 1995 WL 134751, *2 (Mar. 29, 1995). In *Arbuckle*, the defendant was arrested for driving without a license and for having an expired license plate. *Id.* at *1. The police officer began an inventory search of the defendant's vehicle "in preparation for having it towed." *Id.* After heroin was discovered during the search, the defendant moved for suppression. *Id.* at *2. The question on appeal concerned the definition of the word "impound" and the defendant argued "that a vehicle is not 'impounded' until it is placed" in one of the areas designated for the storage of impounded vehicles. *Id.* at *3. He claimed that in his case, the vehicle "was searched before it was 'impounded.' " *Id.* at *2. The Ninth District Court of Appeals looked into the definition of the word "impound" and concluded that

> Defendant's van was "impounded" at the point the officer decided that defendant was not going to be permitted to drive it from the scene and that instead it was going to be towed to one of the locations where the department kept impounded vehicles.

*Id.* at *3; *see also State v. Fry*, 9th Dist. Summit No. 16718, 1994 WL 700089, *2 (Dec. 14, 1994), fn. 3 (" 'Impound' means '[t]o seize and take into the custody of the law or of a court.' Black's Law Dictionary (6 Ed. Rev.1990) 756."). Although *Arbuckle* focused on determining when the impoundment giving rise to the search officially begins, the reasoning applied by the Ninth District Court of Appeals, is applicable to this case.

{¶17} The Ohio Supreme Court's reasoning, in a case almost factually identical to the instant matter, also supports the definition of "impoundment," as it is used by the OSHP and advanced by the State. *See State v. Robinson*, 58 Ohio St.2d 478, 391 N.E.2d 317 (1979). In *Robinson*, the defendant was pulled over for speeding and arrested upon a discovery that he had a suspended driver's license. *Id.* at syllabus. "[A] tow truck was summoned for the purpose of transporting appellee's vehicle *to a commercial storage lot* for impoundment." (Emphasis added.) *Id.* "Prior to the arrival of the truck, the arresting officer procured a standard inventory form from his police cruiser and began a custodial inventory of appellee's automobile." *Id.* In the vehicle's trunk, the officer found a large amount of marijuana. *Id.* The issue for suppression concerned lawfulness of the "inventory search of the trunk." *Id.* at 480. Without expressly distinguishing between a tow to a private company's lot and a tow to the police-owned or police-operated storage facility, the Ohio Supreme Court described the situation as one involving "a lawfully impounded automobile." *Id.* at 479, 480.

{¶18} We have found no Ohio cases supporting Calvin's position,[3] but many other cases that treat the action of lawfully towing a defendant's vehicle at the direction and control of a police officer upon an arrest of the vehicle's sole occupant as equivalent to the impoundment for the Fourth Amendment purposes. For example, in *State v. Kemp*, 8th Dist. Cuyahoga No. 95802, 2011-Ohio-4235, the defendant was arrested for driving with a suspended license. *Id.* at ¶ 6. A *private* tow company was called to take the vehicle to the impound lot. *Id.* The Eighth District Court of Appeals applied the inventory search exception to the case, holding that "the police had proper justification to search the car prior to *towing* it." (Emphasis added.) *Id.* at ¶ 19. No distinction was made between the terms "tow" and "impound," and the use of a private towing company did not convert the situation to one outside of the inventory search exception.

{¶19} In *State v. Hoke*, 2nd Dist. Champaign No. 07-CA-01, 2008-Ohio-757, the vehicle was never impounded. In that case, a police officer "initially decided he was going to have Hoke's truck towed" and searched the vehicle "pursuant to his department's inventory policy." *Id.* at ¶ 11. It was later determined that the defendant's father was able to take the defendant and the

---

[3] Even the case from Louisiana, cited by Calvin in his Brief at 10, does not support his proposition. *See State v. Dorociak*, 493 So.2d 173 (La.App.1986). In *Dorociak*, the court focused on reviewing the officer's *actions* and held that, *under the totality of the circumstances*, they did not support a conclusion that the officer was performing an inventory search because they were insufficient to achieve the purpose of "protecting the occupant from loss of valuables," the "tow truck was not called before the search commenced," and "[f]ormal impoundment practices were not followed for, at the time the officer looked in the window the car was not going to be impounded but merely towed." *Id.* at 176. The fact that the car was supposed to be "merely towed" was one of the factors that allowed the court to determine that the police officer had engaged in an unreasonable investigatory search rather than an inventory of the defendant's vehicle. *See id.* at 176.

vehicle home, and the vehicle was released. *Id.* The inventory search performed pursuant to the initial decision to have the vehicle towed was found to have been proper. *Id.* at ¶ 9-12. Of note, the terms "tow" and "impound" were not distinguished, but were used interchangeably throughout the opinion. *Compare id.* at ¶ 5 ("[t]he officers decided to *impound* the pickup truck") *with id.* at ¶ 11 ("Sergeant Reese testified he initially decided he was going to have Hoke's truck *towed*") (emphasis added); *see also State v. Broughton*, 8th Dist. Cuyahoga No. 88974, 2007-Ohio-5067, ¶ 4-18 (holding that the police officers did not violate the defendant's Fourth Amendment rights when they inventoried the vehicle prior to it being *towed*).

{¶20} We further note that the policy in support of the inventory search exception, as outlined by the United States Supreme Court in *Opperman*, applies to the instant case, irrespective of whether a private tow truck and lot or a police-operated tow truck and lot are used. *See* 428 U.S. at 369, 96 S.Ct. 3092, 49 L.Ed.2d 1000. The property left in the vehicle is subject to the same risk of being lost or stolen, and the dangerous items in the vehicle are potentially harmful to the public, whether they are in the physical custody of the police or the towing company at the direction and control of the police. *See Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). In *Dombrowski*, which was decided prior to *Opperman* and its recognition of the inventory search exception, the defendant's "automobile was towed to *a private garage*," "[a]t the direction of

the police, and for elemental reasons of safety." (Emphasis added.) *Id.* at 443. The United States Supreme Court noted that although "[t]he police did not have actual, physical custody of the vehicle * * * [,] the vehicle had been towed there at the officers' directions." *Id.* at 446. The court held that "the type of caretaking 'search' conducted here of a vehicle that was neither in the custody nor on the premises of its owner, and that had been placed where it was by virtue of lawful police action, was not unreasonable solely because a warrant had not been obtained." *Id.* at 447-448. The court expressly recognized "concern for the safety of the general public" and held that "[t]he fact that the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable." *Id.* at 447. Similarly applicable are concerns for protecting the defendant's property and protecting the public servants from claims over the property, whether public or private service providers are used at the direction of the police. *See Opperman* at 369.

{¶21} A review of the state and federal law concerning an administrative inventory search of a vehicle prior to having it towed brings a unanimous conclusion that Calvin's vehicle was "impounded," as this term is used for the purpose of the Fourth Amendment analysis. We therefore proceed to analyze Calvin's remaining contentions, which concern the OSHP's procedures in place for conducting an inventory search of vehicles.

-14-

*2. Was the Decision to Tow Reasonable?*

**{¶22}** Calvin next argues that the OSHP did not have an "intelligible policy" for impounding or towing vehicles. (App't Br. at 11.) He thus claims that the mandate that the police follow standardized procedures or established routine is not satisfied in this case. *See Opperman* 428 U.S. at 375, 96 S.Ct. 3092, 49 L.Ed.2d 1000. Calvin relies on a case from the Second District Court of Appeals and its holding that an impoundment " 'policy,' " which "left the decision of whether to tow an arrested suspect's vehicle *completely* up to the arresting officer's discretion," violated the requirements of the Fourth Amendment. (Emphasis added.) *State v. Myrick*, 2nd Dist. Montgomery No. 21287, 2006-Ohio-580, ¶ 27. In *Myrick*, there was no written policy submitted to the trial court and the testimony indicated that "even if the Trotwood Police possessed a written tow policy, the decision to tow a vehicle [was] not based on an objective, standardized set of criteria," but was "based on the whim of the arresting officer." *Id.* at ¶ 23.

**{¶23}** Here, Sergeant Fletcher admitted that there is no "official policy" or a "manual" that would be designed "specifically for" the determination on whether to tow or not. (Tr. at 38:21-25, 41:4-7, 53:12-15.) Yet, he referred to the written policy submitted by the State, which directs the police officers "to remove motor vehicles or other property from the scene to a location of greater security" in the situations of "abandonment, traffic crashes, criminal investigations and certain

-15-

arrest actions." (Ex. 1, § (A)(3).) Sergeant Fletcher testified that this policy is used when making decisions on whether to have a vehicle towed, and it deals with "the reasons that we tow the vehicle." (Tr. at 23:13-18.) Thus, this case is distinguishable from *Myrick*. Here, although there is discretion to determine whether a vehicle tow is necessary in any given situation, the decision is made *pursuant to a written policy of the OSHP* and it is based on the totality of the circumstances and the officer's experience, not on the unfettered discretion of the police officer. (*See* Tr. at 21:14-22:5, 53:9-10; Ex. 1.)

{¶24} The United States Supreme Court expressly sanctioned the use of fettered police discretion in deciding whether to impound the vehicle.

> Nothing in *Opperman* or *Lafayette* prohibits the exercise of police discretion so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity. Here, the discretion afforded the Boulder police was exercised in light of standardized criteria, related to the feasibility and appropriateness of parking and locking a vehicle rather than impounding it. There was no showing that the police chose to impound Bertine's van in order to investigate suspected criminal activity.

*Bertine*, 479 U.S. at 375-376, 107 S.Ct. 738, 93 L.Ed.2d 739. Only unfettered discretion is unreasonable and the case before us, does not involve such a situation. *See United States v. Arrocha*, 713 F.3d 1159, 1163 (8th Cir.2013) ("The requirement that discretion be fettered, however, has never meant that a decision to impound must be made in a 'totally mechanical' fashion.... It is not feasible for

a police department to develop a policy that provides clear-cut guidance in every potential impoundment situation...").

{¶25} Calvin asserts that the OSHP wording is "ineffective to establish a reasonable tow/impound policy." (App't Br. at 11.) Yet, this policy, and its application in Calvin's case, is consistent with the well-established principle that "[t]he authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *Opperman*, 428 U.S. at 369, 96 S.Ct. 3092, 49 L.Ed.2d 1000. The Second District Court of Appeals in the case on which Calvin relies recognized this authority, noting that " '[a] car may be impounded if it is evidence in a criminal case, used to commit a crime, obtained with funds derived from criminal activities, or unlawfully parked or obstructing traffic; or if the occupant of the vehicle is arrested.' " (Emphasis omitted.) *Myrick*, 2nd Dist. Montgomery No. 21287, 2006-Ohio-580, at ¶ 25, quoting *State v. Taylor*, 114 Ohio App.3d 416, 683 N.E.2d 367 (1996); *see also Kavanagh*, 113 Ohio St.3d 67, 2007-Ohio-1103, 862 N.E.2d 810, at ¶ 13, quoting R.C. 4513.61. Therefore, the policy based on this well-recognized authority is reasonable. Furthermore, there is no dispute that Calvin's vehicle was stopped on a busy highway and that Calvin was arrested and unable to remove the vehicle from the highway. Thus, the decision to tow Calvin's vehicle was in compliance with the OSHP's reasonable procedures in place.

**{¶26}** We hold that Sergeant Fletcher's decision to tow Calvin's vehicle was reasonable under the circumstances.

*3. Was the Trunk Search Reasonable?*

**{¶27}** Calvin's last contention is based on the method in which Sergeant Fletcher searched the trunk of the vehicle. The OSHP policy OSP-200.10, states:

> The following areas should be checked for items of value:
>
> * * *
>
> Trunk area, to include any side panel compartment and under the spare tire (when the trunk key is available, unless exigent circumstances exist or probable cause exists to indicate items of value are present).

(Ex. 1 § 8.) Calvin submits that "[i]n the instant case, no trunk key was available" and therefore, Sergeant Fletcher did not comply with the OSHP procedures, making the search unreasonable. (App't Br. at 13.)

**{¶28}** Sergeant Fletcher testified that he had a key, but "there was no button on the key fob that would open the trunk." (Tr. at 36:13-14.) He did not recall whether there was "a place on the outside of the trunk for where you would put a key in." (Tr. at 36:15-17.) The record is thus unclear on the issue of whether the "trunk key" was available.[4] It is clear, however, that due to the faulty mechanism for opening the trunk, the key would have been useless for opening the trunk and

---

[4] We note that on the video of the stop, Sergeant Fletcher is seen manipulating by the trunk and appears to be inserting a key into the trunk of Calvin's vehicle. (*See* Ex. 3, at minute 26:05-26:16.) This would indicate that the trunk key was present and the OSHP procedures were thus satisfied in their literal reading. But because no finding of fact that there was a trunk key was made by the trial court, we will not use this observation to determine the outcome of this case.

that an alternative method for opening the trunk was being used. In these circumstances, strict compliance with the search procedures was not possible.

**{¶29}** But strict compliance is not required to satisfy the reasonableness standard of the Fourth Amendment. *See State v. Goodin*, 4th Dist. Athens No. 99CA29, 2000 WL 134733, *5 (Jan. 28, 2000) ("failure to strictly comply with the policies regarding inventory searches does not in itself invalidate the inventory search of appellant's automobile"); *State v. Addy*, 10th Dist. Franklin No. 96APA08-1098, 1997 WL 84649, *3 (Feb. 27, 1997) ("The search, as the trial court noted, was in substantial compliance with police procedures; the deviation did nothing to impair the reasonableness of the procedures employed. As a result, the search of defendant's vehicle did not violate his rights under the United States or Ohio Constitutions."). As we noted above, "[i]t is not feasible for a police department to develop a policy that provides clear-cut guidance in every potential impoundment situation... ." *Arrocha*, 713 F.3d at 1163. That is why the United States Supreme Court stated that " '[t]he test of reasonableness cannot be fixed by Per se Rules.' " *Opperman* at 373, quoting *Coolidge*, 403 U.S. at 509-510, 91 S.Ct. 2022, 29 L.Ed.2d 564 (Black, J., concurring and dissenting). Where, as here, a police officer is faced with a situation that is not expressly covered by the written policy, the reasonableness of the case " 'must be decided on its own facts.' " *Id.*

**{¶30}** Although the written policy in this case did not cover situations in which a trunk key is not usable or not needed, other sections of the policy provide guidance on how to determine which areas and containers should be searched in various situations. Section 5, Scope of Inventory, states,

> The scope of the inventory and the level of security for the property which is inventoried is the responsibility of the officer whose signature appears on the appropriate inventory report.

(Ex. 1.) Section 7, which addresses closed containers, states,

> Recent court opinions have indicated that closed containers may be inventoried. This includes locked and unlocked luggage and briefcases as well as other closed, sealed, or taped containers. Should a key be available, locked containers should be opened and the contents inventoried. Should a key not be available, the decision to open locked containers should be based on the *totality of the circumstances* and whether the contents of the container can be determined by the container's exterior.

(Emphasis added.) (*Id.*) Additionally, section 8, which describes the area of inventory, states that the passenger compartment of a motor vehicle should be checked for items of value. "The passenger compartment is defined as any place the occupant can reach without exiting the vehicle." (*Id.*)

**{¶31}** Therefore, the procedures in place required Sergeant Fletcher to secure any property within Calvin's vehicle or be responsible for it. (*See* Ex. 1 § 5.) The procedures further allowed Sergeant Fletcher to decide to open any locked container based on the totality of the circumstances (*see id.* § 7), and mandated a search of "any place the occupant can reach without exiting the vehicle" (*id.* § 8).

We believe that Sergeant Fletcher properly followed these procedures when faced with the totality of the circumstances in this case. Because Calvin's trunk was accessible from the interior of the vehicle without a key, searching the trunk to secure the items within it was not unreasonable. *See Opperman* at 376, fn. 10 ("once the policeman was lawfully inside the car to secure the personal property in plain view, it was not unreasonable to open the unlocked glove compartment, to which vandals would have had ready and unobstructed access once inside the car").

**{¶32}** For all of the foregoing reasons, we hold that the trial court did not err in denying Calvin's motion to suppress and we overrule the assignment of error on appeal.

### *Conclusion*

**{¶33}** Having reviewed the arguments, the briefs, and the record in this case, we find no error prejudicial to Appellant in the particulars assigned and argued. The judgment of the Common Pleas Court of Hancock County, Ohio is therefore affirmed.

*Judgment Affirmed*

**ROGERS, P.J. and PRESTON, J., concur.**

**/hlo**